KAL K. SHAH (*Pro Hac Vice*)
kshah@beneschlaw.com
BENESCH, FRIEDLANDER, COPLAN
 & ARONOFF LLP
71 South Wacker Drive, Suite 1600
Chicago, IL  60606
Tel:  (312) 212.4979
Fax:  (312) 757.9192

MICHAEL S. WEINSTEIN (*Pro Hac Vice*)
mweinstein@beneschlaw.com
BENESCH, FRIEDLANDER, COPLAN
 & ARONOFF LLP
200 Public Square, Suite 2300
Cleveland, OH 44114
Tel: (216) 363.4500
Fax: (216) 363.4588

BRIAN LEDAHL (SBN 186579)
bledahl@raklaw.com
RUSS AUGUST & KABAT
12424 Wilshire Blvd. 12th Fl.
Los Angeles, CA 90025
Tel:  (310) 826.7474
Fax:  (310) 826.6991

*Attorneys for Defendant/Third-Party Plaintiff Feit Electric Co., Inc.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICHIA CORP., | Case No.  2:18-cv-01390-DOC-RAOx |
| Plaintiff, | |
| v. | **DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF** |
| FEIT ELECTRIC CO., INC., | |
| Defendant, | Hearing Date: October 28, 2021 |
| and | Hearing Time: 9:30 a.m. |
| UNITY MICROELECTRONICS, INC. | Special Master: Judge Gonzalez |
| Intervenor-Defendant. | Complaint Filed:  February 20, 2018 |
| | Trial Date:  August 23, 2022 |

FEIT ELECTRIC CO., INC.

      Third-Party Plaintiff,

           v.

SEOUL SEMICONDUCTOR CO., LTD., LUMILEDS LLC, AND LG INNOTEK HUIZHOU CO., LTD.,

      Third-Party Defendants.

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott Labs. v. Sandoz, Inc.*,
  566 F.3d 1282 (Fed. Cir. 2008) .............................................................. 7

*Accent Packaging, Inc. v. Leggett & Platt, Inc.*,
  707 F.3d 1318 (Fed. Cir. 2013) ............................................................ 18

*CANVS Corp. v. United States*,
  126 Fed. Cl. 106 (Fed. Cl. 2016) ............................................................ 4

*Chi. Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*,
  677 F.3d 1361 (Fed. Cir. 2012) ............................................................ 12

*E-Pass Techs., Inc. v. 3Com Corp.*,
  473 F.3d 1213 (Fed. Cir. 2007) .............................................................. 3

*Geneva Pharms., Inc. v. Glaxosmithkline PLC*,
  349 F.3d 1373 (Fed. Cir. 2003) .............................................................. 5

*GPNE Corp. v. Apple Inc.*,
  830 F.3d 1365 (Fed. Cir. 2016) ............................................................ 20

*Honeywell Int'l, Inc. v. ITT Indus.*,
  452 F.3d 1312 (Fed. Cir. 2006) .............................................................. 7

*Kinetic Concepts, Inc. v. Blue Sky Med. Grp., Inc.*,
  554 F.3d 1010 (Fed. Cir. 2009) ............................................................ 19

*Markman v. Westview Instr., Inc.*,
  517 U.S. 370 (1996) .............................................................................. 2

*MBO Labs., Inc. v. Becton, Dickinson & Co.*,
  474 F.3d 1323 (Fed. Cir. 2007) ............................................................ 18

*Morton Int'l, Inc. v. Cardinal Chem. Co.*,
  5 F.3d 1464 (Fed. Cir. 1993) ................................................................. 5

*Nautilus, Inc. v. Biosig Instr., Inc.*,
  572 U.S. 898 (2014) ............................................................... 4, 5, 21, 22

i

*Netword, LLC v. Centraal Corp.*,
   242 F.3d 1347 (Fed. Cir. 2001) ............................................................20

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*,
   521 F.3d 1351 (Fed. Cir. 2008) ............................................................20

*Omega Eng'g., Inc, v. Raytek Corp.*,
   334 F.3d 1314 (Fed. Cir. 2003) ........................................................4, 12

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (en banc) ..........................................3, 4

*SciMed Life Sys. v. Advanced Cardiovascular Sys.*,
   242 F.3d 1337 (Fed. Cir. 2001) ..........................................................7, 8

*Synchronoss Techs., Inc. v. Dropbox, Inc.*,
   987 F.3d 1358 (Fed. Cir. 2021) ............................................................21

*Thorner v. Sony Comput. Entm't Am. LLC*,
   669 F.3d 1362 (Fed. Cir. 2012) ..............................................................4

*United States Surgical Corp. v. Ethicon, Inc.*,
   103 F.3d 1554 (Fed. Cir. 1997) ..............................................................3

*Verizon Serv. Corp. v. Vonage Holdings Corp.*,
   503 F.3d 1295 (Fed. Cir. 2007) ..............................................................8

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996) ........................................................3, 4, 6

*Wilson Sporting Goods v. Hillerich & Bradsby*,
   442 F.3d 1322 (Fed. Cir. 2006) ..............................................................3

**Statutes**

35 U.S.C. § 112 ....................................................................................4, 5, 21

**TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................... 1

II.   BACKGROUND OF THE TECHNOLOGY ................................................. 1

III.  LEVEL OF SKILL IN THE ART .................................................................. 2

IV.   CLAIM CONSTRUCTION PRINCIPLES .................................................... 2

V.    DISPUTED CLAIM TERMS AND PHRASES ............................................. 5

    A.    "resin" .................................................................................................. 5

    B.    "Notch" Terms ..................................................................................... 8

    C.    "…disposed in a region *below* an upper surface of the metal part…" ........... 13

        1.    The Specification Supports Giving Meaning to All of the Terms,
             Including "Region" and "Below an Upper Surface" ........................... 14

        2.    By Requiring Resin Directly Under Metal, Plaintiff's Proposed
             Construction Improperly Reads the Preferred Embodiments Out
             of the Claims ...................................................................................... 18

    D.    Inner side wall surface ....................................................................... 21

VI.   CONCLUSION ............................................................................................ 22

## I.    INTRODUCTION

This case relates to lighting technology, specifically light emitting diode ("LED") packages. An LED package is a semiconductor component that provides the light source in various LED lighting products such as LED lamps or light bulbs.

Plaintiff Nichia Corporation ("Nichia" or "Plaintiff") is a Japanese company that manufactures and supplies LED packages to various customers to be incorporated into lighting applications. Defendant Feit Electric Co., Inc. ("Feit Electric") is one such customer. Notably, Feit Electric does not design or manufacture the LED packages at issue. Rather, it sources them or has previously sourced them from various suppliers such as Nichia, Intervenor Unity Microelectronics Inc. ("Unity"), Third-Party Defendant, LG Innotek Huizhou Co. Ltd. ("LGITHZ"), or one of the other third-party defendants to this case. Nichia nonetheless sues Feit Electric ostensibly to gain leverage and market share in the LED package industry. Indeed, many of LED Packages in the originally accused products are licensed, yet Nichia has ignored that fact and engaged in a multi-year patent infringement campaign against Feit Electric. Ultimately, Feit Electric is confident that Nichia's antics will be appropriately addressed by the Court.

In the interim, Feit Electric, Unity, and LGITHZ ("Defendants") provide their positions as to claim construction as to certain disputed terms in the asserted patents. Defendants' proposed constructions stay true to the disclosure of the patents and the *quid pro quo* Nichia made with the patent office.  In contrast, Nichia seeks to unduly expand the claim scope to encompass processes and structures beyond those disclosed or invented. Accordingly, to the extent this Court proceeds with claim construction, Defendants respectfully request that their proffered constructions be adopted.

## II.    BACKGROUND OF THE TECHNOLOGY

At issue in this case are three related patents in the field of LED technology, namely, U.S. Patent No. 8,530,250 (the "'250 Patent"), U.S. Patent No. 9,490,411 (the "'411 Patent") and U.S. Patent No. 9,537,071 (the "'071 Patent") (collectively, "the Patents-in-

1

Suit"). The Patents-in-Suit pertain generally to a light emitting diode ("LED") package and to a method for manufacturing the same. ('250 patent at 1:17-21.)[1] An LED package is a semiconductor-based component that provides internal circuitry for an LED lighting product. An LED package consists of a light emitting element which is mounted on a lead frame made of metal, light reflecting material, and a housing made of thermosetting resin. (*Id.*) Light emitting elements (and hence LEDs) are a type of semiconductor that can be used to generate light. (*Id.* at 1:27-29.) The light emitting element is mounted on the metal frame. The lead frame is notched to provide open areas in which the metal frame has been removed. Thermosetting resin is applied to the package so as to fill in the openings, or notches, in the lead frame, without leaving any gaps. (*Id.* at 3:8-12.)

Once the resin is molded to the lead frame, individual LED packages are then cut out, or "singulated." (*Id.* at 6:32-38). The resin-molded body is cut out along a notch, which reduces the amount of the metal lead frame that has to be cut. (*Id.* at 3:32-35, 6:26-31.) As a result of singulation by cutting along the notch, the outside surface of the package is a single plane with both resin and exposed metal leads. (*Id.* at 2:63-3:1.) This allows the simultaneous manufacture of multiple light emitting devices while maintaining a high adhesion between the lead frame and the resin. (*Id.* at 2:49-53.)

## III. LEVEL OF SKILL IN THE ART

A person of ordinary skill in the art at the time of the '250, '411, and '071 patents would have had a bachelor's degree in Mechanical Engineering, Material Science, or a related degree, and two years of work experience in LED packaging and design; or equivalent work experience.

## IV. CLAIM CONSTRUCTION PRINCIPLES

Claim construction is a question of law reserved for the Court. *Markman v. Westview Instr., Inc.*, 517 U.S. 370, 372 (1996). The Court's goal in construing claim terms is to

---

[1] The '250, '411, and '071 patents share substantially the same specification. For ease of the Court, Defendants' citations are to the '250 patent unless otherwise noted.

resolve "disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims." *United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997).  "[W]hile a claim is not to be construed in light of the accused device in an infringement case, it must inevitably be construed in context of the accused device." *Wilson Sporting Goods v. Hillerich & Bradsby*, 442 F.3d 1322, 1327 (Fed. Cir. 2006) (citing *SRI Intl v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1118 (Fed. Cir. 1985).  This is because "any articulated definition of a claim term ultimately must relate to the infringement question that it is intended to answer."  *E-Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213, 1219 (Fed. Cir. 2007).  The starting point for claim construction is a term's "ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc). "In many cases that give rise to litigation, however, determining the ordinary and customary meaning of the claim requires examination of terms that have a particular meaning in a field of art." *Id*. at 1314. Because that meaning "is often not immediately apparent, and because patentees frequently use terms idiosyncratically," courts look to various sources to determine the appropriate construction. *Id*. (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc*., 381 F.3d 1111, 1116 (Fed. Cir. 2004)).

The "most significant source of the legally operative meaning of disputed claim language" is the "intrinsic evidence." *Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576, 1582 (Fed. Cir. 1996). Intrinsic evidence consists of including the claims themselves, the specification, and the prosecution history. *Id*. Accordingly, the first step is to "look to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention." *Id*. Second, "it is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning." *Id*. Third, "the court may also consider the prosecution history of the

3

patent," which "contains the complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims." *Id*.

When the patentee "'clearly set[s] forth a definition of the disputed claim term' other than its plain and ordinary meaning," that lexicography governs. *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (quoting *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)). In addition, if a patentee unequivocally disavows the full scope of a claim term, either in the specification or during prosecution, "the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender." *Omega Eng'g., Inc, v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003). "There are no magic words that must be used" by the patentee to limit the claim scope through lexicography or disavowal. *CANVS Corp. v. United States*, 126 Fed. Cl. 106, 113-14 (Fed. Cl. 2016) (quoting *Hill–Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1373 (Fed. Cir. 2014)). Rather, a patentee's statement that "indicate[s] a clear intent" to deviate from the ordinary and customary meaning of the claim language is sufficient. *Id.*

After considering intrinsic evidence, the Court may also consider extrinsic evidence. Although extrinsic evidence is generally less desirable than intrinsic evidence, courts may rely on extrinsic evidence, such as expert testimony and technical dictionaries, to "help educate the court regarding the field of the invention" and "determine what a person of ordinary skill in the art would understand claim terms to mean." *Phillips*, 415 F.3d at 1317-19.

Patents are addressed "not [] to lawyers, or even to the public generally, but rather to those skilled in the relevant art." *Nautilus, Inc. v. Biosig Instr., Inc.*, 572 U.S. 898, 909 (2014). As such, patent claims terms must be readily understood without speculation or subjectivity, i.e., they must be definite. 35 U.S.C. § 112 ¶ 2 (requiring a patent specification to "conclude with one or more claims particularly pointing out and distinctly claiming the

subject matter which the applicant regards as his invention"). More specifically, "the definiteness inquiry trains on the understanding of a skilled artisan at the time of the patent application, not that of a court viewing matters post hoc." *Nautilus, Inc.*, 572 U.S. at 911. Where a claim is subject to differing, arbitrary or subjective applications, it is invalid as being indefinite and failing to comply with 35 U.S.C. § 112. *See, e.g., Morton Int'l, Inc. v. Cardinal Chem. Co*., 5 F.3d 1464, 1470 (Fed. Cir. 1993) ("Since the evidence shows that the claims at issue here are not sufficiently precise to permit a potential competitor to determine whether or not he is infringing, we also agree with the district court's determination that the claims are invalid [pursuant to § 112 ¶ 2]."); *Geneva Pharms., Inc. v. Glaxosmithkline PLC,* 349 F.3d 1373, 1384 (Fed. Cir. 2003) (same).

## V.   DISPUTED CLAIM TERMS AND PHRASES

### A.   **"resin"**

| Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "resin"<br><br>'250 Patent: claims 1, 2, 7, 15<br><br>'411 Patent: claims 1, 2, 6, 7, 15, 18, and 19<br><br>'071 Patent: claims 15, 16, 17, 23, and 25 | The words of the claims should be given their plain and ordinary meaning. | "thermosetting resin" |

The Court's adoption of Defendants' construction of *resin* to require a thermosetting resin would render a significant number of accused products noninfringing. Those accused products contain a "thermoplastic" resin, the same kind of resin the patentee disparages in the "background art" section of the specification. ('250 Patent at 1:42-64.)

"The most significant source of the legally operative meaning of disputed claim language" is the intrinsic evidence, which includes the specification. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  Here, the phrase "thermosetting resin" appears over 50 times in the common specification.  Indeed, a thermosetting resin is the only kind of resin the specification expressly teaches in its descriptions of the invention's embodiments.  The first three embodiments specifically teach use of thermosetting resin.  "It is preferable to use as the resin package 20 a translucent thermosetting resin…"  ('250 Patent at 6:55-56.) "The resin package has and is made by integrally molding a resin part formed with the thermosetting resin and the leads." (*Id.* 7:38-39.)  "A thermosetting resin containing a light-reflecting material is transfer-molded in the mold sandwiched by the upper mold and lower-mold to form the resin-molded body 124 in the lead frame." (*Id.* at 13:42-45; 15:7-10.)  The descriptions of the fourth and fifth embodiments each note that "[d]escriptions of some configurations employing the substantially same configurations as the light emitting device according to the first embodiment will be omitted where necessary." (*Id.* at 15:31-33; 16:2-4.)  The description of the sixth embodiment contains almost the same language. (*Id.* at 16:41-45.)  The one example provided of the sixth embodiment again expressly teaches to use a thermosetting resin: "An epoxy resin which is a thermosetting resin is used for the resin part 25." (*Id.* at 17:30-31.)  Its description of how to mold the resin package again teaches a "thermosetting resin." (*Id.* at 17:66-18:8.) These six are all the embodiments in the Patents-in-Suit.  None suggests using a thermoplastic resin.

The specification explains why all six embodiments are made with a thermosetting resin.  It claims advantages of using thermosetting resin in the claimed invention over the "conventional"—or prior art—methods of manufacturing light emitting devices using thermoplastic resins.  The first is that thermosetting resin results in better adhesion.  "With the [claimed invention's] configuration, the thermosetting resin is filled in the notch parts, and therefore an adhering area between the lead frame and the thermosetting resin becomes

large, so that it is possible to improve adhesion between the lead frame and the thermosetting resin." ('250 patent at 3:8-12.)  Additionally, the specification explains that a thermosetting resin has, or can have, lower viscosity than thermoplastic resins have.  "[A] thermosetting resin having lower viscosity than a thermoplastic resin is used, so that it is possible to fill the thermosetting resin in the notch parts without leaving a gap."  (*Id.* at 3:14-16.)

The patentees' consistent description of the "invention" as being the use of "thermosetting" resin should preclude Nichia from claiming that its claims cover methods for manufacturing light emitting devices using other—and very different—kinds of resins. *SciMed Life Sys. v. Advanced Cardiovascular Sys.*, 242 F.3d 1337 (Fed. Cir. 2001) is instructive.  In *SciMed*, the Federal Circuit affirmed a district court's construction which limited the scope of claims directed to balloon dilatation catheters used in angioplasty to catheters having a coaxial lumen configuration.  242 F.3d at 1339-1340.  The claim language, standing alone, would have covered the "dual lumen" configuration of the accused catheter products.  *Id.* at 1339.  The district court correctly focused, however, on specification language describing the coaxial lumen structure as the "basic sleeve structure for all embodiments of the present invention contemplated and disclosed herein."  *Id.* Therefore, the district court concluded that a person skilled in the art would understand from the specification that the inventor envisioned only one design, with the coaxial lumen structure, and the Federal Circuit agreed.  *Id.* at 1339-40.  "Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question."  *Id.* at 1341.  *See also Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1291 (Fed. Cir. 2008) (affirming the district court's construction of "crystalline" as "Crystal A" given the "exclusive focus on Crystal A in the specification as well as the prosecution history of the [patent]"); *Honeywell Int'l, Inc. v. ITT Indus.*, 452 F.3d 1312,

1318 (Fed. Cir. 2006) (affirming the construction of "fuel injection system component" as being limited to a "fuel filter" because a "fuel filter was not merely discussed as a preferred embodiment" but "[o]n at least four occasions, the written description refers to the fuel filter as 'this invention' or 'the present invention'"); *Verizon Serv. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007) ("When a patent thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention.")

The specification at issue here fits the *SciMed* pattern. Here, in addition to disclosing only embodiments that expressly use thermosetting resins, the specification deliberately disparages "conventional" methods of manufacturing that use a thermoplastic resin. ('250 patent at 1:41-53.) First, the "thermoplastic resin has little adhesion with a lead frame, and the resin part and lead frame are likely to be detached." (*Id.* at 1:54-56.) Second, in recent years, "the output of a light-emitting element is remarkably improved, and, as the output of a light emitting element is increased, light deterioration of a package made of a thermoplastic resin becomes more distinct." (*Id.* at 1:59-63.)

For all of the foregoing reasons, the Court should construe "resin" as "thermosetting resin."

## B.   "Notch" Terms

| Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "a notch is formed in the metal part"<br><br>'411 Patent: claim 1<br><br>'071 Patent: claims 15, 16 | there is an opening or indentation in the metal part | an opening or indentation with at least three sides is formed in the metal part |
| "notch [in the lead frame]"<br><br>'250 Patent: claims 1, 12, 15, 16 | an opening that penetrates the lead frame | an opening or indentation with at least three sides in the lead frame |

Defendants propose to construe the above-identified "notch" terms consistently. For efficiency, Defendants address in detail only the term "a notch is formed in the metal part." Defendants' proposed construction for this term places appropriate bounds on the term "notch," as disclosed in the specification. The term "notch," standing alone, does not appear in the written description of the Patents-in-Suit. Instead, the term "notch part" is used in reference to certain openings formed in the lead frame. For example, the Patents-in-Suit disclose a lead frame 21 into which notch parts 21a are formed. ('411 Patent at Fig. 7 ("notch parts" 121a); *Cf.*, *e.g.*, *id.* at 14:5-50 (referring to circular openings 121b in Fig. 7 "hole parts").)

Fig. 3



('411 Patent at Fig. 3.)

The Patents-in-Suit further disclose a "singulation" process by which the lead frame is cut along the notch parts in the process to form individual light emitting devices. (*E.g.*, '411 Patent at 7:3-18.) This is illustrated below:

9



('411 Patent at Fig. 3 (annotated).)

One of ordinary skill in the art would understand that, by this process, multiple "metal parts," are formed, each having the below geometry.



One of ordinary skill in the art would further understand that the "notch parts" of the lead frame (lower left) yield the claimed "notch" in the metal part after singulation (lower right):





10

These openings or indentations have at least three sides, i.e., they have at least a side (1) bounded with additional sides (2) and (3), such that the first side is recessed within the outer boundary of the metal part.  Every "notch part" disclosed by the Patents-in-Suit results in this shape with three sides in the metal part after a singulation process.



Defendants' proposed construction captures this meaning and is consistent with the usage of the term "notch" throughout the disclosure of the Patents-in-Suit.

In contrast, Plaintiff's proposed construction is overly broad.  Plaintiff's construction equates notch with an opening or indentation without any restriction as to the number of sides.  Therefore, this proposed construction would improperly encompass configurations that are <u>not</u> "notches," as claimed.  For example, the below "arc shaped" configuration may be encompassed in Plaintiff's overly broad construction.



However, the Patents-in-Suit refer to the above configuration as an "arc shape," not "notch."  In describing the light emitting device of the second embodiment, shown below, the Patents-in-Suit state that "[t]he corner parts of the outer upper surface 120c of the resin package 120 are formed in an arc shape.  Further, the side surface of the lead 122 is formed in an arc shape seen from the upper surface."  ('411 Patent at 13:56-60.)

11

('411 Patent at Fig. 6 (annotated).)

Because the terms "arc shape" and "arc-shaped" appear in the Patents-in-Suit, including in the claims of the '250 Patent, the claim term "notch" should be understood to be different than an "arc." *See Chi. Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1369 (Fed. Cir. 2012) (applying the "general presumption that different [claim] terms have different meanings."). Defendants' proposed construction honors the distinction between the terms "notch" and "arc." Plaintiff's proposed construction does not, and is therefore improper.

The term "notch" should be similarly construed with respect to the '250 Patent. Where a claim term is used in multiple patents in the same patent family, it should be construed similarly. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003) ("[W]e presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning."). Defendants' proposed construction adheres to this principal. The only substantive difference in Defendants' proposed constructions for the "notch" terms reflects the material in which the notch is formed, i.e., "the metal part" or "in the lead frame", which comes from the terms themselves. Plaintiff's proposed construction for "notch" in the '250 Patent is not consistent with its proposed construction for the corresponding terms in the '411 and '071 Patents. Defendants' proposed construction should be adopted.

### C.   "…disposed in a region *below* an upper surface of the metal part…"

| Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "wherein both a part of the metal part and a part of the resin part are disposed in a region *below* an upper surface of the metal part, on four outer lateral surfaces of the resin package"<br><br>'411 Patent: claim 1 | "wherein both a part of the metal part and a part of the resin part are disposed in a region *underneath* an upper surface of the metal part, on four outer lateral surfaces of the resin package" | Plain and ordinary meaning. |

Plaintiff's proposed construction of "a part of the metal part and a part of the resin part are disposed in a region below an upper surface of the metal part, on four outer lateral surfaces of the resin package" seeks to replace the term "below" with "underneath." The word "below" is simple and well-understood, and it would be improper to replace this term with another well-understood word, "underneath," which is intended to change the term's meaning and is inconsistent with the intrinsic record.

Plaintiff's proposed change disregards the specification's use of the term "surface," excludes all of the preferred embodiments of the '411 patent as shown in the figures, and fails to give meaning to all of the words in the claim including "region" and "upper surface." Plaintiff's proposal seeks to improperly rewrite the claim limitation to require a part of the resin part to be ***directly under*** the metal part.

The plain meaning of this term requires—as expressly recited in claim 1 and shown in the figures—resin in a "region" that is "below an upper surface" of the metal part. Plaintiff's proposed construction, on the other hand, rewrites claim 1 to require the resin to be directly under metal—failing to give meaning to the terms "region" and "below an upper surface." In effect, Plaintiff's proposal improperly rewrites the claim to require resin "disposed ~~in a region~~ <u>directly under</u> ~~below an upper surface of~~ the metal part." As set forth below, the Court should reject this attempt to rewrite the claim.

### 1. The Specification Supports Giving Meaning to All of the Terms, Including "Region" and "Below an Upper Surface"

The specification supports giving the term "both a part of the metal part and a part of the resin part are disposed in a region below an upper surface of the metal part, on four outer lateral surfaces of the resin package" its plain and ordinary meaning. Consistent with that meaning, the figures for *all* embodiments in the '411 patent disclose resin that is disposed in a "region" that is "below an upper surface" of the metal part, and none shows it *directly under* the upper surface of a metal part.

For example, Figure 1, which corresponds to the first embodiment, discloses a part of the metal part (shown in blue) and a part of the resin part (shown in green) are disposed in a region below an upper surface of the metal part (outlined in blue), on four outer lateral surfaces of the resin package (outlined in red):



('411 patent, Fig. 1.) No portion of resin part 25 is located *directly under* metal on the four outer lateral surfaces.

Consistent with the plain meaning of "below an upper surface," Figure 1 shows a part of the metal part and a part of the resin part below (i.e., at a lower level than) an upper

surface of the metal part.  The specification repeatedly refers to surfaces of the resin package or leads as having a "level" or "levels." ('411 patent, 4:63-65, 15:2-5, 16:30-33, 17:3-6, 17:44-46.)  And claim 14 recites "a distance between said surfaces at two or more different levels is in a range of about 1/4 to about 4/5 of a thickness of the metal part," (*id.*, 20:24-26), which confirms that position relative to a surface is determined with respect to the level of that surface.  Similarly, a person of ordinary skill in the art would have understood that when resin is "below" an upper surface, as in claim 1, it must be at a lower level than the upper surface.  Additionally, consistent with the plain meaning of "region," Figure 1 shows that the "region" extends beyond the metal leads to include both metal and resin below an upper surface of the metal part (as outlined in blue).  There is no requirement that the metal and resin parts in the region stacked vertically, or that the region be bounded by a portion of a metal plate.

Each of the remaining preferred embodiments are in agreement.  The corresponding figures show resin in a "region" that is "below an upper surface" of the metal part:

| Embodiment | Figure |
|---|---|
| Second Embodiment | Fig. 6. |

| Embodiment | Figure |
|---|---|
| Third Embodiment | <br><br>Fig. 9. |
| Fourth Embodiment | Fig. 11. |

| Embodiment | Figure |
|---|---|
| Fifth Embodiment | Fig. 12<br><br>Fig. 12. |
| Sixth Embodiment | Fig. 13<br><br>Fig. 13. |

Thus, consistent with the plain meaning, all of the embodiments in Figures 1, 6, 9, and 11-13 depict "both a part of the metal part and a part of the resin part are disposed in a region below an upper surface of the metal part." *None shows any resin directly under an upper surface of the metal part.*

### 2.   By Requiring Resin Directly Under Metal, Plaintiff's Proposed Construction Improperly Reads the Preferred Embodiments Out of the Claims

Plaintiff implies that "below an upper surface of the metal part" requires resin "underneath" or directly under metal.   However, Plaintiff's proposed construction is inconsistent with the specification because it improperly excludes the preferred embodiments of the '411 patent.   As discussed above, and as shown in the figures, none of the preferred embodiments have resin located directly under an upper surface of the metal part on four outer lateral surfaces of the resin package.   ('411 patent, 6:21-18:5, Figs. 1, 6, 9, 11-13.)   The Federal Circuit is clear that "a claim [construction] that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct."   *Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1326 (Fed. Cir. 2013); *see also MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007) (reversing district court's claim construction for the term "adjacent" where the construction excluded two different preferred embodiments shown in the figures).   Thus, Plaintiff's proposed construction should be rejected because by reading in the requirement that resin be located directly under metal, the patent's preferred embodiments would not be covered by the claims.

### A.   The Cutting Step

| Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "the cutting step being performed such that an outer surface of the resin part and an outer surface of the at least one lead are planar at an outer side surface of the resin package"<br><br>'250 Patent: claim 1 | The term "planar" is already construed. The remaining words of the claims should be given their plain and ordinary meaning. | the cutting step being performed to form an outer side surface of the resin package where the at least one lead has an exposed surface at a bottom edge that is planar with an exposed surface of the resin part |

The "cutting step" term recited in claim 1 of the '250 Patent requires construction to ensure that it is not interpreted in a manner greater than what is supported by the

specification.  *See Kinetic Concepts, Inc. v. Blue Sky Med. Grp., Inc.*, 554 F.3d 1010, 1019
(Fed. Cir. 2009) (confining term so as not to "expand the scope of the claims far beyond
anything described in the specification.").  Defendants' proposed construction properly
tethers the claim term to the purported invention.  With reference to each of the
embodiments disclosed in the Patents-in-Suit, the at least one lead has an exposed surface
at a bottom edge, and this surface is co-planar with the resin part.



('250 Patent, Figs. 1, 6, 9, 12 and 13 (annotated in red).)

This arrangement is a natural consequence of the only relevant manufacturing
process disclosed in the specification.  In particular, the Patents-in-Suit disclose that the
lead frames 21, 121, and 221 are either of uniform thickness, in the case of lead frames 21
and 121, or have grooves 221c, in the case of lead frame 221.  ('250 Patent, Figs. 3, 7, and
10.)  Grooves 221c are provided only in a direction orthogonal to that which form the outer
side surfaces.  (*Id.* at Fig. 10.)  The Patents-in-Suit further disclose that the lower mold 62,
which with upper mold 61 sandwiches lead the lead frame before injecting the resin, has a
flat surface.  ('250 Patent at 11:58-67.)  As a result, and as shown in Figure 4 (see below),
when resin 23 is injected, it does not occupy a region below the lead frame along the sides
that become the outer side surfaces after singulation.  This disclosed process ***necessarily***
results in the outer surface of the lead being disposed at a bottom edge of the side surface,

19

as illustrated in *every* disclosed embodiment of the Patents-in-Suit.  ('250 Patent, Figs. 1, 6, 9, 12 and 13 (see above).)



('250 Patent, Fig. 4 (partial).)

Defendants' proposed construction captures this consistent disclosure in *every* disclosed embodiment and prevents the term from being construed such that it is not supported by the specification.  *See GPNE Corp. v. Apple Inc.*, 830 F.3d 1365, 1670 (Fed. Cir. 2016) ("[W]hen a patent repeatedly and consistently characterizes a claim term in a particular way, it is proper to construe the claim term in accordance with that characterization) (internal quotations omitted); *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1352 (Fed. Cir. 2001) ("[T]he claims [do not] enlarge what is patented beyond what the inventor has described as the invention.").

Plaintiff's proposal to not construe the term should be rejected.  The parties have a dispute over the scope of the claim.  Thus, telling the jury that the words of this phrase should be given their "plain and ordinary meaning" invites the jury to construe the term itself.  This is improper.  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("When the parties raise an actual dispute regarding the proper scope of [the] claims, the court, not the jury, must resolve that dispute.").

### D.     Inner side wall surface

| "inner side wall surface" <br><br> '250 Patent: claim 12 | Not indefinite, and the words of the claims should be given their plain and ordinary meaning. | Indefinite |
|---|---|---|

The term "inner side wall surface," which appears in claim 12 of the '250 Patent, should be found to render claim 12 invalid for indefiniteness.  The claimed lead frame has multiple inner surfaces that can define a notch, and the specification does not provide any information that would inform one skilled in the art about the scope of claim 12.

The Patent Act require that a patent application's "specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."  35 U.S.C § 112, ¶ 2.  Therefore, a "patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  *Nautilus, Inc., v. Biosig Instrs., Inc.*, 572 U.S. 898, 901 (2014); *see also Synchronoss Techs., Inc. v. Dropbox, Inc.*, 987 F.3d 1358, 1366 (Fed. Cir. 2021).

Claim 1 requires "providing a lead frame comprising at least one notch;…" ('250 Patent at 19:39.)  Claim 12, dependent on Claim 1, adds the limitation "wherein a inner side wall surface of the lead frame surrounding the at least one notch comprises concave portions."  (*Id.* at 20:35-37.)  Defendants have not located the claim term "inner side wall surface" anywhere in the specification, although the terms "side surface" (*id.* at 13:7), "upper surfaces" (*id.* at 13:11), and "outer bottom surfaces" (*id.* at 13:12) of the lead appear.  One might expect to find an answer in the specification's description of the lead and lead frame in the '250 patent at 8:45-9:31, which does discuss concavity in a sectional shape of the etched lead frame (*id.* at 8:49-62) and about how notch parts are to be formed (*id.* at 9:7-20), but this section lacks any reference anything like an "inner side wall

surface."  The description of a third embodiment states that plating processing is applied to the "circular inner surface of the lead frame 121," but neither this language nor any Figure relating to the third embodiment explain what is meant by "inner side wall surface" in claim 12.

Interestingly, the specification's "Description of Reference Signs" describes the label 27b as "Inner side surface," which is close to the claim phrase proposed for construction. ('250 patent at 19:26.) On inspection, however, this surface cannot be the "inner side wall surface" of claim 12.  The description of label 27 is "Concave part."  (*Id.* at 19:24.) Figure 2, a sectional view illustrating the light emitting device according to the first embodiment (*id.* at 18:37-38), and the associated text are instructive.  The surface labelled 27b is an inner surface of the concave part of the resin package.  (*Id.* at 6:12-14.) It is not a surface of a lead frame, as required in claim 12.  The leads 22 in Figure 2 are arranged in the outer bottom surface of the resin package.  (*Id.* at 6:9-10.)

In short, the plain language of "inner side wall surface" in claim 12 is ambiguous, and nothing in the specification can inform one skilled in the art, with reasonable certainty, about the scope of the invention of claim 12.  Accordingly, the term is indefinite and the claim invalid.  *See Nautilus, Inc.*, 572 U.S. at 901.

## VI.   CONCLUSION

For the foregoing reasons, the Court should adopt Defendants' proposed constructions for each of the disputed claim terms.

Dated:  August 27, 2021

By:  */s/ Kal K. Shah*

Kal K. Shah (*Pro Hac Vice*)
kshah@beneschlaw.com
**BENESCH, FRIEDLANDER,**
     **COPLAN & ARONOFF LLP**
71 South Wacker Drive
Chicago, IL 60606
Tel:  (312) 212-4979
Fax:  (312) 757-9192

Michael S. Weinstein (*Pro Hac Vice*)
mweinstein@beneschlaw.com
**BENESCH, FRIEDLANDER,**
     **COPLAN & ARONOFF LLP**
200 Public Square, Suite 2300
Cleveland, OH 44114
Tel:  (216) 363-6228
Fax:  (216) 363-4588

Brian Ledahl (SBN 186579)
bledahl@raklaw.com
**RUSS AUGUST & KABAT**
12424 Wilshire Boulevard, 12th Floor
Los Angeles, CA 90025
Tel: (310) 826-7474
Fax: (310) 826-6991

*Attorneys for Defendant/Third-Party Plaintiff Feit Electric Co., Inc.*

By: */s/ Elizabeth H. Rader*

Elizabeth H. Rader (SBN 184963)
elizabeth@calliopelaw.com
**CALLIOPE LEGAL**
Box 1041
3750 Olney Laytonsville Road
Olney, MD  20832
Tel: (202) 400-1003
Fax:(650) 346-9926

*Attorney for Defendant-Intervenor, Unity Microelectronics, Inc.*

By: /s/ *Andrew V. Devkar*
Andrew V Devkar (SBN 228809)
andrew.devkar@morganlewis.com
**MORGAN LEWIS AND BOCKIUS LLP**
2049 Century Park East Suite 700
Los Angeles, CA 90067-3109
Tel:  (310) 907-1000
Fax:  (310) 907-1001

*Attorney for Third-Party Defendant LG Innotek Huizhou Co., Ltd.*

## DECLARATION OF CONSENT TO ELECTRONIC SIGNATURE:

Pursuant to Central Dist. L.R. 5-4.3.4(a)(2), the undersigned hereby attests that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized this filing.

/s/ *Kal K. Shah*_____
Kal K. Shah (*Pro Hac Vice*)

## CERTIFICATE OF SERVICE

I hereby certify that on August 27, 2021, I electronically filed the foregoing *Defendants' Opening Claim Construction Brief* with the Clerk of Court using CM/ECF, which will send notification via electronic means to all counsel of record.

/s/ Kal K. Shah
Kal K. Shah (*Pro Hac Vice*)